## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**PEARLIE CARROLL,**

      **Plaintiff,**

**vs.**                                        **CASE NO. 4:06cv465-RH/WCS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).  It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

Plaintiff, Pearlie Carroll, applied for disability insurance benefits and supplemental security income benefits.  Plaintiff was 40 years old at the time of the administrative hearing, had a 9th grade education, and had past relevant work as a cashier II, waitress, nurse's assistant, and a convenience store manager.  Plaintiff

alleges disability primarily due to uncontrolled diabetes mellitus, coronary artery disease, and obesity.

The Administrative Law Judge (ALJ) found that while Plaintiff is unable to perform her past relevant work, she could perform a significant range of sedentary work limited to simple, routine, low stress work with frequent, but not continuous, use of her upper extremities and avoidance of pulmonary irritants.  R. 15.  Relying upon vocational testimony that identified jobs that a person with such limitations could perform, he found that Plaintiff is not disabled as defined by Social Security law.  R. 18-19.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which

support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)-(f):

1.    Is the individual currently engaged in substantial gainful activity?

2.    Does the individual have any severe impairments?

3.    Does the individual have any severe impairments that meet or
       equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.     Does the individual have any impairments which prevent past relevant work?

5.     Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Analysis**[1]

**The ALJ's decision**

The ALJ determined at step 2 that Plaintiff suffers from several "severe" impairments (diabetes mellitus, coronary artery disease, and chronic pulmonary obstructive disease), but that none of these met or equaled a listed impairment.  R. 14. He determined that Plaintiff has the residual functional capacity to perform a significant range of sedentary work, limited to simple, routine, low stress work with only frequent

---

[1] Descriptions of the purposes and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE , available from Westlaw.  Medical terms come from DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, available at:  http://www.mercksource.com (Medical Dictionary link).  Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html

rather than continuous use of her upper extremities, and avoiding pulmonary irritants. R. 15.  He determined that Plaintiff's testimony concerning the severity of her symptoms was "not entirely credible in light of the reports of the treating and examining practitioners and the findings made on examination."  R. 16.  The ALJ further determined that Plaintiff cannot do her past relevant work.  R. 17.  Relying upon the vocational expert's testimony, he found Plaintiff to be not disabled.  R. 18.

**Testimony at the administrative hearing**

Plaintiff testified at the administrative hearing on March 6, 2006, that she last worked in 2003, stopping because her "diabetes kept going up and down."  R. 300.  She said she was told by her boss that "she can't be coming in every time I have trouble with my sugar and stuff.  I need to decide to either quit or she was going to fire me."  *Id.*  She said she got dizzy at work and sometimes had to leave.  *Id.*  Plaintiff said her blood sugar level for the past few weeks had been "real high, like 200 something."  R. 301.

Plaintiff testified that she drives herself to the doctor.  R. 302.  She said that in the morning after breakfast, she tries to clean for 10 or 15 minutes, but her arms and legs "get to hurting so bad" that she sometimes has to lie down.  *Id.*  She said she thought she could stand for only 15 or 20 minutes before having to sit or lie down due to pain in her legs and arms.  *Id.*  and R. 308.  She did not think she could do much lifting, and when she sat for a long period of time, she experienced the same kind of pain.  *Id.*

Plaintiff said that when her blood sugar level was elevated, she felt "extra tired" and when the blood sugar was too low, she would fall asleep.  R. 304.  She also had headaches when her blood sugar became too low.  *Id.*  She said that the last time her

blood sugar was too low was three or four months earlier, but that did not happen often. *Id.* She said she became dizzy when her blood sugar was too high.  R. 305.

Plaintiff said that when she uses her hands and arms, "it hurts so bad.  Like even folding clothes, I fold two or three pieces, I have to stop."  R. 305.  She said that after ten minutes of using her arms and hands, she had to stop due to pain.  *Id.*  Plaintiff said she had trouble gripping things with her hands, and broke dishes when she washed them.  R. 308.

Plaintiff said that her legs felt numb every day, and her legs and feet burned and ached.  R. 306.  She used lotion to cool her feet, but that helped only temporarily.  *Id.*

Plaintiff testified that she usually would lie down three or four times a day for about 30 minutes.  R. 306.  Some days were better and some were worse.  *Id.*  She had to lie down due to pain in her arms and legs.  R. 307.  She said that on a good day her pain level was about five on a scale of ten; on a bad day it was eight.  *Id.*  She said that she had severe pain more than once or twice a week.  *Id.*

The vocational expert testified that significant pain affects the ability to do work because it "affects persistence, pace, reliability, [and] ability to complete tasks in a timely manner . . . ."  R. 310.  The expert testified that

> . . . with diabetes we look at the extent which – the reliability factor, the
> frequency of their episodes of uncontrolled symptoms.  In addition, too,
> neuropathies are often regularly associated with some of those particular
> diagnoses.  Therefore, [INAUDIBLE] stand, walk, climb, squat, kneel, in
> addition to upper extremity problems, including things like grasping,
> [INAUDIBLE] to include reaching and handling which – you limit reaching
> and handling of less than frequent, you preclude 89 percent of all jobs.

R. 310.  The expert said there are no jobs that Plaintiff could do if she suffers the symptoms and limitations as to which she testified.  R. 311.  He said that having to lie

down three or four times a day, considered alone, would preclude all work, and likewise, all work would be precluded if Plaintiff had the hand impairments (grip, dropping things) as to which she testified.  *Id.*

The ALJ then asked the vocational expert to assume a hypothetical individual able to do sedentary work limited to simple, routine tasks that did not take a great deal of concentration.  He asked the expert to further assume an individual able to do work that was not highly stressful, avoiding excessive pulmonary irritants, and able to use his or her upper extremities frequently to reach and handle objects.  R. 311-312.  The expert said that such an individual could do a number of jobs that exist in substantial numbers in the national economy.  R. 312.

**The medical evidence**

On November 8, 2003, Plaintiff went to the Gadsden Community Hospital feeling "low" and with a severe temporal headache.  R. 112.  It was noted that she had type I diabetes.  *Id.*  The clinical impression was hyperglycemia.[2]  R. 114.  Plaintiff's glucose level was 366.  R. 115.  The normal range is from 70 to 110.  *Id.*

On November 17, 2003, Plaintiff was treated at the Liberty County Health Department.  R. 203.  She reported that her blood sugars had been running in the 300s, and she complained of fatigue.  *Id.*  The examining nurse practitioner determined that Plaintiff had neuropathy[3] in her fingers and her feet.  *Id.*  Her blood sugar level was 196

---

[2] Hyperglycemia is abnormally increased glucose in the blood, such as in diabetes mellitus.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[3] Neuropathy is a functional disturbance or pathological change in the peripheral nervous system, sometimes limited to noninflammatory lesions as opposed to those of neuritis.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

by home test on December 1, 2003.  R. 198.  Most of the readings in this record were

by using a test at home.  On December 12, 2003, Plaintiff reported by telephone that

her blood sugar level was fluctuating (it was then at 84) and she had a headache.  R.

196.  On December 15, 2003, Plaintiff had a blood sugar level of 221.  R. 195.  The

level was 210 on December 22, 2003, and was 203 on December 29, 2003.  R. 194,

190.

On February 2, 2004, it was noted that Plaintiff's blood sugar level was 202.  R.

183.  The impression was uncontrolled diabetes (IDDM), hypothyroidism, elevated

cholesterol, and obesity.  *Id.*  Plaintiff weighed 228 and her weight had been increasing

over this period.  R. 183-203.  Plaintiff's diabetes remained uncontrolled through

February 16, 2004.  R. 178.  On March 25, 2004, Plaintiff reported "lots of neuropathy in

[her] feet (tingling & burning) . . . ."  R. 176.  Plaintiff asked for medicine for this

symptom.  *Id.*  Her diabetes was uncontrolled.  *Id.*

On April 8, 2004, Plaintiff's blood sugar level was 170.  R. 174.  Her diagnosis

was uncontrolled diabetes, hypothyroidism, elevated cholesterol, bronchitis, and

tobacco abuse.  R. 174.  She was advised to stop smoking.  R. 173.  Plaintiff weighed

232 pounds on May 4, 2004.  R. 172.  Her weight increased to 236 pounds by May 18,

2004.  R. 170.  A diagnosis of neuropathy with a question mark, and a prescription of

neurontin,[4] is in the notes.  *Id.*

---

[4] Neurontin is indicated for management of postherpetic neuralgia and as an adjunctive therapy in the treatment of partial seizures.  PHYSICIANS' DESK REFERENCE (2005).

On June 1, 2004, Plaintiff was examined on a consultative basis by Muhammad Naeem, M.D.  R. 133.  Dr. Naeem is board certified in internal medicine.  *Id.*  He reported that Plaintiff said she tried to do chores at home, although her twelve year old son helps in mopping and cleaning, she drove a motor vehicle, and "is pretty much independent in her general routine, activity and business."  *Id.*  Dr. Naeem noted from tests that Plaintiff has uncontrolled diabetes and uncontrolled hypothyroidism.  *Id.*  He found Plaintiff to be "positive for fatigue and muscle aches" and negative for headache, vision disturbance, dizzy spells, faintness or focal weakness.  *Id.*  He noted that Plaintiff had worked on and off for ten to twelve years, and last worked in November, 2003, as a convenience store cashier.  R. 134.  He found Plaintiff to be obese, weighing 233 pounds with a height of 5 feet 2 inches.  *Id.*  He found no edema, cyanosis,[5] or clubbing of the extremities.  *Id.*  Dr. Naeem noted that Plaintiff had possible peripheral neuropathy.  R. 135.  He determined that Plaintiff had full range of motion of all body joints, and was able to do fine manipulation, pushing, and pulling with both hands.  *Id.*  He said she could sit, stand, walk, and climb onto the table without difficulty.  *Id.*  He concluded that while she has "multiple problems, which needs [sic] chronic ongoing medical care," he did not "find any limitations in her day to day activities as long as she is properly taking [sic] care of medically."  *Id.*

---

[5] A bluish discoloration, especially of the skin and mucous membranes due to excessive concentration of deoxyhemoglobin in the blood.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

On June 15, 2004, Plaintiff was diagnosed with intermittent claudication.[6]  R. 168.

On July 8, 2004, it was noted that Plaintiff had a blood sugar level of 136.  R. 167.

There had been many low readings overall, but the blood sugar was elevated in the

morning.  *Id.*  The two a.m. readings had been in the 80's and 90's.  *Id.*

On July 26, 2004, Plaintiff reported that she had been sleeping very poorly,

making her tired the next day.  R. 166.  Her blood sugar level was 142.  *Id.*  It was

reported that Plaintiff was not smoking tobacco as much, only one to two cigarettes per

day.  *Id.*  She was still sleeping poorly on August 9, 2004.  R. 164.  Trazodone,[7] which

had been prescribed for sleeping, was not working.  *Id.*  Her blood sugar level was 132

and control of her blood sugar level was improving.  *Id.*

On August 16, 2004, Plaintiff's treating physician, Mari K. Thomas, D.O.,

completed a form entitled "Medical Statement Regarding Diabetes for Social Security

Disability Claims."  R. 163.  Dr. Thomas indicated on this form that Plaintiff had type I

diabetes.  *Id.*  She said that she had "Neuropathy demonstrated by significant and

persistent disorganization of motor function in two extremities resulting in sustained

disturbance of gross and dexterous movements, or gait and station."  *Id.*  This is the

wording of a criterion for meeting Listing 9.08A.  If this were true, then Plaintiff's

diabetes met Listing 9.08A.  Dr. Thomas also indicated that Plaintiff had "impaired

arterial blood flow," with "intermittent claudication" and "hyperlipidemia."  *Id.*  She said

that Plaintiff could stand for 60 minutes at one time, sit for two hours at one time,

---

[6] Claudication is limping or lameness.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[7] Trazodone hydrochloride, sold as Desyrel, is an antidepressant.  PHYSICIANS' DESK REFERENCE (2002), p. 518.  The brand name not later editions.

occasionally lift 10 pounds, frequently lift 5 pounds, balance occasionally, but could work only 4 to 6 hours daily.  *Id.*

On September 28, 2004, Plaintiff complained of leg cramps with walking or at night, and pain in her buttocks, both of which resolved when she stopped and rubbed her legs.  R. 162.  Plaintiff was advised to walk daily to increase "neovascularization" and to stop smoking.  *Id.*  On October 29, 2004, Plaintiff's weight had increased to 240 pounds.  R. 161.  On November 29, 2004, Plaintiff weighed 245 pounds, and a note was made to discuss her obesity at the next visit.  R. 160.

On December 20, 2004, Plaintiff reported that she had experienced swelling in her feet and hands, mostly in the evening or early morning.  R. 159.  Upon examination, minimal external edema of the hands and feet was noted.  *Id.*  HCTZ was prescribed for the swelling.  *Id.*  Her weight was 243 pounds and her blood sugar level was 128.  *Id.*

On January 18, 2005, Plaintiff's blood sugar level was 113.  R. 158.  Plaintiff was still smoking against medical advice.  R. 158.  On February 1, 2005, Plaintiff reported that she was "feeling well" and was walking every day, but still smoking a couple of cigarettes daily, she had a "wheeze," and her sinuses continued to both her.  R. 253. She smelled of smoke.  *Id.*  Chronic sinusitis was among the several diagnoses.  *Id.*

On February 14, 2005, it was noted that a few days earlier, Plaintiff had reported at the emergency room that she had experienced numbness and tingling in her left arm and fingers, and occasional chest numbness.  R. 251.  Pain was radiating in her left arm.  *Id.*  An ambulance was called, and it was thought that she might have had a light heart attack.  *Id.*  She obtained relief from nitroglycerin.  *Id.*   Dr. Thomas's assessment was angina.  *Id.*   She advised Plaintiff to stop smoking.  *Id.*

Plaintiff was seen again on followup on February 21, 2005, complaining of breathing difficulty the night before.  R. 250, 249.  Her blood sugar level was 110.  R. 250.  It was noted that she continued to complain of numbness in her left arm to her elbow joint.  *Id.*  It was found that she had a history of unstable angina.  R. 248.  A cardiac appointment had been scheduled for March 15, 2005.  R. 250.  Plaintiff was still smoking cigarettes and told to stop.  *Id.*

Plaintiff returned on February 28, 2005.  R. 247.  She had experienced chest pain the previous night but she took nitroglycerin and it lasted only five or ten minutes.  *Id.*  Her weight was 242 and her blood sugar level was 102.  *Id.*  It was noted that Plaintiff smelled of tobacco smoke.  *Id.*  It was strongly recommended that she stop smoking immediately and that she limit any exertion until her cardiac evaluation.  *Id.*  The diagnosis was angina, tobacco abuse, poorly controlled diabetes mellitus, elevated cholesterol, and obesity.  *Id.*

On April 4, 2005, Plaintiff complained of swelling in her feet and legs.  R. 246.  Mild puffiness of the feet was noted.  *Id.*

On April 12, 2005, Plaintiff was seen for a cardiac consultation by Michael F. Morrow, M.D.  R. 237.  Dr. Morrow noted "leg pain with walking, possibly secondary to claudication."  *Id.*  He planned a test of her lower extremities to evaluate peripheral vascular disease.  *Id.*  He noted that Plaintiff smoked a pack of cigarettes a day.  *Id.*  Her weight was 255 pounds and she had no trace of pretibial edema.  *Id.*  She had the stress test on April 20, 2005, but it was terminated after two and one-half minutes

because of dyspnea[8] and fatigue, but no chest discomfort or diagnostic EKG changes beyond baseline were noted.  R. 259.  The results were read as abnormal, with a moderate sized area of decreased uptake in a portion of the anterior, anteroapical and apical of the lateral wall region.  *Id.*  The EKG results were basically normal, but the study was "technically limited" "due to poor sound wave transmission associated with the patients' body habitus."  R. 260.

On April 25, 2005, Plaintiff's blood sugar level was 106.  R. 244.  On May 17, 2005, Plaintiff again was seen by Dr. Morrow, complaining of atypical chest heaviness lasting one to two hours at a time, several times a week.  R. 236.  Her weight was 255.  *Id.*  A cardiac catheterization was tentatively scheduled for June 8, 2005.  *Id.*

On June 2, 2005, Plaintiff was seen by Dr. Thomas, complaining of left leg pain and severe cramping with walking.  R. 243.  Her blood sugar level was 101.  *Id.*  She said that the pain would resolve if she rested for several minutes, but walking again brought a prompt return of symptoms.  *Id.*  She said that the pain was bad at night, and caused her to awaken three times a night.  *Id.*  She would hang her leg off the bed for relief.  *Id.*  The assessment was intermittent claudication, moderate to severe.  *Id.*

On June 7, 2005, Plaintiff's blood sugar level was 288.  R. 257.  On June 14, 2005, after the cardiac catheterization, Plaintiff was seen again by Dr. Morrow.  R. 235.  He noted from the catheterization, conducted on June 5, 2005, that Plaintiff had multiple nonobstructive lesions and a subtotally occluded diagonal lesion.  *Id.*  He concluded that

---

[8] Dyspnea is breathlessness or shortness of breath; difficult or labored respiration. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

Plaintiff had coronary artery disease with occluded diagonal branch, but overall, Plaintiff was "doing quite well" and he did not plan to see her again for a year.  *Id.*

On October 17, 2005, Plaintiff's glucose level was 279.  R. 254.  On February 28, 2006, she reported experiencing some hip pain, generally worse in the morning, better as the day goes on.  R. 288.  This was thought to be osteoarthritis of the right hip.  *Id.* On March 3, 2005, Plaintiff received a prescription for Naprosyn.[9]  R. 287.  On March 7, 2006, Plaintiff again reported some pain in her feet, worse at night.  *Id.*  Her blood sugar level was 213.  *Id.*  Dr. Thomas's diagnosis was diabetes poorly controlled and diabetic neuropathy.  *Id.*  On March 31, 2006, Plaintiff weighed 243 pounds and her blood sugar level was 190.  R. 286.

### Whether at step 2 the ALJ should have found that Plaintiff's extreme obesity was a "severe" impairment

The ALJ did not find that Plaintiff's obesity was a "severe" impairment.  R. 14. Plaintiff contends that this was error and resulted from a failure to follow Social Security Ruling (SSR) 02-01p.

At step 2 of the analysis, the issue is whether Plaintiff has shown that she has a condition which has more than "a minimal effect on her ability to:  walk, stand, sit, lift, push, pull, reach, carry, or handle, etc."  Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20 C.F.R. § 404.1521).[10]  "Step two is a threshold inquiry.  It

---

[9] Naprosyn is a nonsteroidal anti-inflammatory drug.  PHYSICIANS' DESK REFERENCE (2004), p. 2902.

[10] "In other words, the 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality."  McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).  "[I]n order for an impairment to be non-severe, 'it

allows only claims based on the most trivial impairments to be rejected.  The claimant's

burden at step two is mild."  <u>McDaniel v. Bowen</u>, 800 F.2d 1026, 1031 (11th Cir. 1986)

(clarifying <u>Brady v. Heckler</u>, 724 F.2d 914, 920 (11th Cir. 1984).  A "severe" impairment

identifies "at an early stage those claimants whose medical impairments are so slight

that it is unlikely they would be found to be disabled even if their age, education and

experience were taken into consideration."  <i>Id.</i>, <i>quoting</i> <u>Bowen v. Yuckert</u>, 482 U.S.

137, 153, 107 S.Ct. 2287, 2297, 96 L.Ed.2d 119 (1987).

Ruling 02-01p provides that obesity "is a risk factor that increases an individual's

chances of developing impairments of most body systems," including diabetes and

cardiovascular impairments.  SSR 02-01p, ¶ 2.  The Ruling provides that "in the

absence of evidence to the contrary in the case record, we will accept a diagnosis of

obesity given by a treating source or by a consultative examiner."  <i>Id.</i>, ¶ 4.  The Ruling

directs that weight is to be considered over time.  <i>Id.</i>

> As with any other medical condition, we will find that obesity is a "severe"
> impairment when, alone or in combination with another medically
> determinable physical or mental impairment(s), it significantly limits an
> individual's physical or mental ability to do basic work activities.  (For
> children applying for disability under title XVI, we will find that obesity is a
> "severe" impairment when it causes more than minimal functional
> limitations.)  We will also consider the effects of any symptoms (such as
> pain or fatigue) that could limit functioning. . . .  Therefore, we will find that
> an impairment(s) is "not severe" only if it is a slight abnormality (or a
> combination of slight abnormalities) that has no more than a minimal effect
> on the individual's ability to do basic work activities (or, for a child applying
> under title XVI, if it causes no more than minimal functional limitations).

─────────────────────

[must be] a slight abnormality which has such a minimal effect on the individual that it
would not be expected to interfere with the individual's ability to work, irrespective of
age, education, or work experience.' "  <u>Parker v. Bowen</u>, 793 F.2d 1177, 1181 (11th Cir.
1986), <i>citing</i> <u>Brady v. Heckler</u>, 724 F.2d 914, 920 (11th Cir. 1984), <u>Edwards v. Heckler</u>,
736 F.2d 625, 630 (11th Cir. 1984), and <u>Flynn</u>, 768 F.2d at 1274.

*          *          *

[W]e will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe.

*Id.*, ¶ 6.

Defendant implicitly concedes that Plaintiff's obese condition should have been identified as a "severe" impairment at step 2, but argues that the error was harmless as there is no evidence that Plaintiff's obesity would preclude her from performing sedentary work.  Doc. 14, pp. 7-8.  The issue as framed asks the court to assume what the ALJ would have concluded had he found Plaintiff's obesity to be a "severe" impairment at step 2.  Had he done so, he would then have carried that impairment forward for his analysis at steps 3, 4, and 5.

The antecedent issue is whether Plaintiff presented evidence at step 2 that her obese condition has more than a minimal effect on her ability to walk, stand, sit, lift, push, pull, reach, carry, or handle.  There is little in this record to suggest that it does.  Plaintiff argues that the evidence lies in the fact that Plaintiff had to stop the cardiac stress test after two and one-half minutes due to fatigue and shortness of breath.  Obesity can be a sign of poor conditioning,[11] and obesity may have played a part in the stress test result, but it is just as likely that Plaintiff's inability to complete the cardiac stress test was due to the fact that she smokes cigarettes and has done so for a long period of time.

Defendant, on the other hand, points to evidence that on February 1, 2005, Plaintiff reported that she was "walking every day."  R. 253.  This is scant evidence from

---

[11] Some obese persons are in good shape and can sustain exertion for long periods of time.

which one might conclude that Plaintiff's obesity does not have more than a minimal effect on her residual functional capacity.  This is the only evidence in the record that Plaintiff does any exercise at all, and the extent of her walks at that time is not known.

Still, there is little evidence Plaintiff's obesity, considered alone, causes any limitations with respect to her residual functional capacity.  Many people who are completely unimpaired for sedentary work, especially a chronic smoker, may be unable to complete a cardiac stress test due to fatigue and shortness of breath.  A finding that Plaintiff has the residual functional capacity to do sedentary work is, as argued by Defendant, consistent with a view that Plaintiff's obesity precludes more strenuous work. That being the case, Defendant's argument that it was harmless error to have not found Plaintiff's obese condition to be a "severe" impairment at step 2 is persuasive.

**Whether the ALJ complied with SSR 96-8p in assessing Plaintiff's residual functional capacity**

Plaintiff contends that the ALJ failed to follow SSR 96-8p because he failed to explain how the medical evidence supported his conclusion that Plaintiff could frequently use her upper extremities while doing sedentary work.  A detailed analysis of

each specific function is required by the SSR.[12]  As noted above, the ALJ found that

Plaintiff could use her upper extremities on a frequent, but not continuous, basis.  R. 15.

In the section wherein the ALJ determined Plaintiff's residual functional capacity,

the ALJ determined that Plaintiff's testimony as to her impairments[13] was not entirely

credible in light of the reports of the treating and examining practitioners, and the

_____

[12] Social Security Rule 96-8p provides that the residual functional capacity (RFC) assessment

> must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945.  Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

SSR 96-8p.

> Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling.  *Each function must be considered separately* (e.g., "the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours"), even if the final RFC assessment will combine activities (e.g., "walk/stand, lift/carry, push/pull").

*Id*. (emphasis added).

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). . . .  The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id*.

[13] Plaintiff testified to rather significant hand and arm impairments.  She said she could not fold clothes due to severe pain.  R. 305.  She also said she had trouble gripping things with her hands and broke dishes when she washed them.  R. 308.

findings they made upon examination.  R. 16.  The first issue, therefore, is whether the

ALJ properly considered Plaintiff's testimony as to the severity of her symptoms:

> In order to establish a disability based on testimony of pain and other
> symptoms, the claimant must satisfy two parts of a three-part test
> showing:  (1) evidence of an underlying medical condition; and (2) either
> (a) objective medical evidence confirming the severity of the alleged pain;
> or (b) that the objectively determined medical condition can reasonably be
> expected to give rise to the claimed pain.  *See Holt v. Sullivan*, 921 F.2d
> 1221, 1223 (11th Cir. 1991).  If the ALJ discredits subjective testimony, he
> must articulate explicit and adequate reasons for doing so.  *See Hale v.
> Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to articulate the
> reasons for discrediting subjective testimony requires, as a matter of law,
> that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d
> 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The reasons articulated for

disregarding the claimant's subjective pain testimony must be based upon substantial

evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532

(11th Cir. 1991).  It is not necessary that the ALJ expressly identify this circuit's pain

standard if his findings "leave no doubt as to the appropriate result" under the law.

Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

Thus, the issue of whether the ALJ properly discounted Plaintiff's testimony as to

her symptoms will turn upon the record evidence relied upon by the ALJ.  The ALJ first

discussed the consultative findings of Dr. Naeem.  R. 16.  He noted that Dr. Naeem

found upon examination that Plaintiff had full range of motion in all joints, was able with

both hands to perform fine manipulation, pushing, and pulling, and was able to climb up

to the examination table and get back down.  *Id*.  He relied upon Dr. Naeem's finding

that Plaintiff was able to walk, sit, and stand without difficulty.  *Id*.  He also noted that Dr.

Naeem concluded that Plaintiff had no limitations upon her daily activities as long as she

had proper medical care.  *Id.*  These findings are indeed in Dr. Naeem's report.  R. 133-135.  The findings are contrary to those of the treating physician, Dr. Thomas, so the issue as to Dr. Naeem's evidence will be whether the ALJ should have given greater weight to the contrary findings of Dr. Thomas.  This will be discussed ahead.

The ALJ next noted that Plaintiff had not been hospitalized for her impairments, other than emergency room treatment, and that she had not received significant active care other than conservative routine maintenance.  R. 16.  He noted that she had been encouraged in the progress notes to walk daily.  *Id.*  These findings are supported by substantial evidence in the record.

The ALJ also found that "there have been no significant increase or changes in prescribed medication reflective of an uncontrolled condition, nor did the claimant describe side effects from her medication that would prevent her from substantial gainful activity."  *Id.*  There is no evidence of adverse side effects from medications, so that finding is supported by substantial evidence in the record.  However, the first part of the sentence is not supported by any evidence.  The record indicates without any dispute that Plaintiff's blood sugar levels were chronically uncontrolled despite many adjustments to her medications.  This error, however, is of no importance if there is no evidence to link Plaintiff's uncontrolled glucose levels to a specific limitation affecting Plaintiff's residual functional capacity.  The relevant issue is not whether Plaintiff's diabetes was under control, but whether during the period in question, Plaintiff suffered from any of the potential disabling consequences of uncontrolled diabetes.

The ALJ found that "no treating or examining source stated that the claimant's impairments were *totally* debilitating or rendered the claimant *completely*

unemployable."  R. 16 (emphasis added).  This statement is carefully worded and

perhaps true as worded.  Whether the ALJ properly discounted the opinion of Dr.

Thomas, Plaintiff's treating physician, will be discussed ahead.

The ALJ also relied upon evidence of Plaintiff's daily activities to support his

residual functional capacity determination.  R. 16.  Instead of relying upon Plaintiff's

*testimony* as to daily activities, the ALJ states that he relied upon a written statement

filed earlier with the claim, citing exhibit 9E.  *Id*.  This seems to be an error in reference

as Exhibit 9E (R. 100-102) does not contain any evidence as to Plaintiff's daily activities.

On April 20, 2004, Plaintiff filled out a form to explain how pain prevented her from

performing her daily activities.  R. 83-84 (Exhibit 5E, consisting of 3 pages).  There,

Plaintiff described very significant limitations of her daily activities.  Perhaps there is

another list of daily activities provided by Plaintiff in this record, but it must be concluded

that the ALJ's reliance upon Plaintiff's own description of her daily activities to support

the residual functional capacity finding is not supported by substantial evidence in the

record.  In any event, the ability to do some limited daily activities is often not substantial

evidence in the record to support a residual functional capacity determination.[14]

---

[14] Ross v. Apfel, 218 F.3d 844, 849 (8th Cir. 2000) ("The ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work."); Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (the court must consider the entire record when determining whether the evidence of a claimant's daily activities is substantial evidence for the conclusion that she retains the residual functional capacity to work); Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) ("Nor do we believe that participation in everyday activities of short duration, such as housework or fishing, disqualifies a claimant from disability or is inconsistent with the limitations recommended by Lewis's treating physicians."); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (when considering daily activities, the entire record must be considered, including the claimant's testimony that she had to lie down after two hours of such work); Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (a conclusory citation to a

Plaintiff argues that the following evidence from the record shows that it was error for the ALJ to find that she had the residual functional capacity to frequently use her upper extremities in a sedentary job.  On November 17, 2003, the examining nurse practitioner found that she had neuropathy in her fingers and feet.  R. 203.  On May 18, 2004, there was a note of "neuropathy" with a question mark and Neurontin was prescribed.  R. 170.  On December 12, 2004, minimal external edema of the hands (and feet) was noted.  R. 159.  On February 14, 2005, Plaintiff reported numbness and tingling in her arm and fingers.  R. 251.  A week later, on February 21, 2005, she said she continued to have numbness in her left arm, with tingling from her upper mid-arm to just below her elbow.  R. 250.  Plaintiff argues that "this shows [that Plaintiff's] conditions would prevent her from performing frequent use of her upper extremities."  Doc. 11, p. 21.

These arguments are not persuasive.  The note of the existence of neuropathy in Plaintiff's fingers on November 17, 2003, provided no evidence as to the degree of impairment caused by the neuropathy, and the medical notes thereafter do not indicate any significant impairment of the hands and arms.  The neuropathy diagnosis of May 18, 2004, was questioned, and a few weeks later, on June 7, 2004,  Neurontin was not among the list of Plaintiff's current medications.  R. 169.  The edema of Plaintiff's hands noted on December 12, 2004, upon examination was minimal.  Finally, the tingling and numbness that occurred in February, 2005, was associated with onset of angina, which

---

claimant's "daily activities" as a basis for failing to believe her testimony as to pain was insufficient where there was a medical condition that reasonably could have given rise to the pain described, and, although she testified that she cooked and shopped for herself, she had trouble putting on her clothing).

thereafter seems to have been adequately managed with nitroglycerin.  This condition

apparently was not diabetic neuropathy.  On the whole, the medical records do not

show any significant upper extremity neuropathy that would cause Plaintiff to be unable

to use her upper extremities frequently during sedentary work.  There is evidence of

lower extremity neuropathy that would cause limitations in ability to stand or walk,[15] but

this has been accommodated by the ALJ's determination that Plaintiff is limited to

sedentary work.

Plaintiff also argues that the ALJ erred by failing to consider Plaintiff's complaints

of fatigue in determining that she could work a full eight hour day.  Cited for this are

pages 133, 166, and 203 of the record.  Doc. 11, p. 22.  On November 17, 2003,

Plaintiff complained of an ear ache and fatigue, implying that the fatigue may have in

part been due to an infection.  R. 203.  She was to force fluids (water), a treatment often

---

[15] The evidence of impairment of the legs is the following, collected from the discussion above. On March 25, 2004, Plaintiff reported "lots of neuropathy in [her] feet (tingling & burning) . . . ." R. 176. On June 15, 2004, Plaintiff was diagnosed with intermittent claudication. R. 168. On September 28, 2004, Plaintiff complained of leg cramps with walking or at night, and pain in her buttocks, both of which resolved when she stopped and rubbed her legs. R. 162. Plaintiff was advised to walk daily to increase "neovascularization" and to stop smoking. *Id.* On December 20, 2004, Plaintiff reported that she had experienced swelling in her feet and hands, mostly in the evening or early morning. R. 159. Upon examination, minimal external edema of the hands and feet was noted. *Id.* On April 4, 2005, Plaintiff complained of swelling in her feet and legs. R. 246. Mild puffiness of the feet was noted. *Id.* On April 12, 2005, Plaintiff was seen for a cardiac consultation by Michael F. Morrow, M.D. R. 237. Dr. Morrow noted "leg pain with walking, possibly secondary to claudication." *Id.* He planned a test of her lower extremities to evaluate peripheral vascular disease. *Id.* On June 2, 2005, Plaintiff was seen by Dr. Thomas, complaining of left leg pain and severe cramping with walking. R. 243. Her blood sugar level was 101. *Id.* She said that the pain would resolve if she rested for several minutes, but walking again brought a prompt return of symptoms. *Id.* She said that the pain was bad at night, and caused her to awake three times a night. *Id.* She would hang her leg off the bed for relief. *Id.* The assessment again was intermittent claudication, moderate to severe. *Id.*

recommended for a temporary infection.   R. 202.  The next day she reported she was

"feeling O.K."  R. 201.  On June 1, 2004, Dr. Naeem found Plaintiff to be "positive for

fatigue and muscle aches" R. 133, but he did not find "any limitations in her day to day

activities as long as she is properly [taken] care of medically."  Fatigue was noted as a

problem on July 20, 2004, due to lack of sleep, and a trial of Trazodone was started.  R.

166.  On August 9, 2004, it was noted that Trazodone had not worked, and she was still

sleeping poorly.  R. 164.  But by September 28, 2004, there were no new complaints of

inability to sleep.  R. 162.  These are the only medical notes of fatigue.  It was not error

for the ALJ to fail to conclude from this evidence that Plaintiff suffers from such chronic

fatigue that she cannot work an eight hour day.

In summary, while some of the reasons cited by the ALJ for his residual

functional capacity determination as to Plaintiff's ability to frequently use her upper

extremities were flawed, so long as he properly discounted the opinion of the treating

physician, Dr. Thomas, and Plaintiff's own testimony, the determination is supported by

substantial evidence in the record.  Further, the determination did sufficiently discuss

the record evidence relating to Plaintiff's ability to use her upper extremities as required

by SSR 96-8p.

**Whether the ALJ failed to consider Plaintiff's impairments in combination**

Plaintiff contends that the ALJ failed to consider her impairments in

combination.[16]  She notes in particular the following impairments:  uncontrolled

---

[16] Impairments must be evaluated in combination when determining whether an
impairment meets or equals a listed impairment at step 3, a claimant's ability to do past
relevant work, other work, or a claimant's residual functional capacity.  Lucas v.
Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990); Swindle v. Sullivan, 914 F.2d 222, 226

diabetes, diabetic neuropathy, headaches, COPD, asthma, allergic rhinitis, extreme

obesity, hypothyroidism, hyperlipidemia,[17] high cholesterol, fatigue, depression, anxiety,

coronary artery disease, and intermittent claudication.  Doc. 11, p. 23.

Most of these ailments were mentioned by the ALJ and considered in

combination.  R. 14-15.  After noting that the medical records indicated that Plaintiff had

uncontrolled insulin dependent diabetes, obesity, hypothyroidism, asthma, chronic

obstructive pulmonary disease (COPD), hyperlipidemia, seasonal allergies, possible

peripheral neuropathy, cramping in the legs, intermittent claudication, and coronary

artery disease, R. 14-15, the ALJ concluded: "The undersigned took into consideration

all [of] the claimant's diagnosed conditions and find[s] that there is minimal clinical

evidence to corroborate or support any finding of significant vocational impact *related

[to] them*."  R. 15.  The ALJ, therefore, considered these impairments separately and

together.  Thus, the contention that the ALJ did not consider all of these conditions in

combination is unpersuasive.

The finding that the clinical evidence does not support a finding of significant

vocational impact relating to the conditions considered in combination is supported by

substantial evidence in the record as well.  The medical record lacks substantial

---

(11th Cir. 1990); Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).  Impairments
must be evaluated in combination even though some impairments are not severe.
Hudson v. Heckler, 755 F.2d 781, 785 and n. 2 (11th Cir. 1985).  The Eleventh Circuit
has "repeatedly held that an ALJ must make specific and well-articulated findings as to
the effect of the combination of impairments when determining whether an individual is
disabled."  Davis v. Shalala, 985 F.2d at 534.

[17] Hyperlipidemia is a general term for elevated concentrations of any or all of the
lipids in the plasma, such as hypertriglyceridemia, hypercholesterolemia, and so on.
DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

evidence that Plaintiff's most serious conditions (uncontrolled diabetes, coronary artery disease, peripheral neuropathy and claudication, COPD, asthma, obesity), either separately or in combination, have in fact caused limitations of residual functional capacity inconsistent with the ALJ's finding that Plaintiff can do a limited range of sedentary work.

### Whether the ALJ gave proper weight to the opinion of the treating physician, Dr. Thomas

Plaintiff contends that ALJ improperly rejected Dr. Thomas's opinion that Plaintiff cannot work longer than four to six hours a day in favor of the opinion of the one-time examining physician, Dr. Naeem.  The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence.  Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992).  This circuit finds good cause to afford less weight to the opinion of a treating physician "when the:  (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004).

The ALJ discounted the opinion of Dr. Thomas because it was a fill-in-the-blank form, without a thorough written report, and because it conflicted "with the substantial evidence of record, documenting less severe limitations."  R. 17.  The ALJ also

reasoned that Dr. Thomas had not considered the entire record, statements of collateral sources, or the objective findings of other treating physicians. *Id.*

That Dr. Thomas used a fill-in-the-blank form is not, standing alone, a sufficient reason to discount her opinion. If her opinion, as reflected on this form, had been supported by findings in her medical records, it would have been entitled to great weight.

Plaintiff is correct that as a treating medical source, Dr. Thomas did not have to consider the entire record, statements of collateral sources, or objective findings of other treating physicians. She was entitled to base her opinion upon her own course of treatment and findings. It is the job of the ALJ, not the treating physician, to consider the entire record.

The fact that some of the medical findings were by a nurse practitioner, acting under the supervision of Dr. Thomas, does not seriously detract from the importance of her findings.[18]   Moreover, Plaintiff represents that many of the medical encounters at the

---

[18] Social security regulations distinguish between medical opinion and opinions from other medical sources. 20 C.F.R. §§ 404.1513(a) and (e)(disability benefits); 20 C.F.R. §§ 416.913(a) and (d) (supplemental security income benefits). Nurse practitioners are considered as "other sources" by paragraph (d)(1), but are not "acceptable medical sources." However, an "other source" listed in 20 C.F.R. §§ 404.1513(d)(1) and 20 C.F.R. §§ 416.913(d)(1) has been considered to be "acceptable medical source," if the source worked in conjunction with an acceptable medical source. Gomez v. Chater, 74 F.3d 967, 971 (9th Cir.), *cert. denied*, 519 U.S. 881 (1996) (nurse-practitioner who worked with a physician). A source works in conjunction with an acceptable medical source if the source works closely under the supervision of an acceptable medical source and acts as his or her agent. *Id.* Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir. 2003) (same). Under Florida law, a licensed physician *must* enter into a formal supervisory relationship with an advanced registered nurse practitioner. FLA. STAT. § 458.348(1)(a). Physicians can be disciplined for failing to supervise a nurse practitioner. FLA. STAT. § 458.331(1)(dd).

Liberty County Health Department were with Dr. Thomas herself.  Plaintiff contends that

Dr. Thomas personally examined Plaintiff eleven times, on May 18, 2004, June 15,

2004, July 8, 2004, July 26, 2004, August 9, 2004, September 28, 2004, November 29,

2004, February 1, 2005, February 14, 2005, February 28, 2005, and June 2, 2005.  R.

160, 162, 166-170, 243, 247, 251, 253.  Dr. Thomas had a significant, continuous

treating relationship with Plaintiff, and ordinarily her opinion would be entitled to great

weight.

But the ALJ's determination that Dr. Thomas's opinion was not supported by the

medical record complies with the case law cited above for evaluating the opinion of a

treating physician and is supported by substantial evidence in the record.  While Dr.

Thomas placed a check mark next to the statement that Plaintiff had "[n]europathy

demonstrated by significant and persistent disorganization of motor function in two

extremities resulting in sustained disturbance of gross and dexterous movements, or

gait and station," R. 163, a finding that her condition met Listing 9.08A, her medical

notes discussed above do not support a finding of significant neuropathic impairment of

the upper extremity.  There is more significant evidence of impairment in the lower

extremity, as discussed above, but this was acknowledged by the ALJ's finding that

Plaintiff could do only sedentary work.

The only other aspect of Dr. Thomas's opinion at issue here was that Plaintiff

could work only four to six hours daily.  R. 163.  The ALJ determined, in effect, that this

was not supported by Dr. Thomas's medical records, and that Plaintiff, therefore, could

work a full eight hour day in a sedentary job.  On the whole this conclusion is supported

by the substantial evidence in the record that has been discussed at length above.  The

evidence of fatigue was minimal, and does not compel a conclusion that Plaintiff cannot work eight hours in a sedentary job.  There was little medical evidence of actual impairment caused by uncontrolled blood sugar levels or obesity.  The onset of angina was controlled with nitroglycerin.

Finally, while Dr. Naeem was only a consultative physician, it was not error to consider his opinion along with all of the other evidence.[19]  Dr. Naeem did not find any significant impairments affecting Plaintiff's residual functional capacity.  For all of these reasons, no error is perceived in the way that the ALJ considered the opinion of the treating physician, Dr. Thomas.

**Conclusion**

Thus, considering the record as a whole, the findings of the ALJ correctly followed applicable law and were based upon substantial evidence in the record. Accordingly, the decision of the Commissioner should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner, to deny Plaintiff's application for Social Security benefits, be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on July 16, 2007.

**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

---

[19] A consultative examination, that is, a one-time examination by a physician who is not a treating physician, need not be given deference by the Commissioner.  McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987).  A residual functional capacity assessment by a consulting physician can be substantial evidence to support a hypothetical to a vocational expert.  Johansen v. Barnhart, 314 F.3d 283, 288 (7th Cir. 2002).  There is contrary authority, however.  Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998) ("opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.").

## NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.